THE PEOPLE, ex rel. CHARLES T. HARVEY et al., Appellants,
   v. EDWARD V. LOEW, Comptroller, etc., Respondent.

The provision of the act of 1885 (Chap. 554, Laws of 1885), authorizing the
   construction of an "illustrated section" of elevated railroad on some
   "duly authorized street," in the city of New York, is violative of the pro-
   vision of the State Constitution (Art. 3, § 18), which prohibits the passing
   of a local or private bill, "granting to any corporation, association or in-
   dividual the right to lay down railroad tracks."
It is also unconstitutional in that no provision is made for compensation to
   abutting owners, or owners of the fee of the street.

(Argued April 27, 1886; decided June 1, 1886.)

APPEAL from order of the General Term of the Supreme
Court, in the first judicial department, made March 5, 1886,
which affirmed an order of Special Term denying a motion for a
peremptory writ of *mandamus*, requiring defendant, as comp-
troller of the city of New York, to pay over to the relator one-
third of the fund referred to in, and as required and directed
by chapter 554, Laws of 1885. (Reported below, 39 Hun, 390.)

*Samuel Hand* for appellants. The act of 1868 (Chap. 855)
is valid as to the subject expressed in the title, although other
sections may be void because not so expressed. (*Patten* v. *N.
Y. E. R. R. Co.*, 3 Abb. N. C. 318; *People* v. *Briggs*, 50 N.
Y. 553, 566, 567; *In re Van Antwerp*, 56 id. 261; *In re
Sackett Street*, 74 id. 95.) The act is not in violation of the
ninth section of article 1 of the Constitution, requiring the as-
sent of two-thirds of the members elected to each house to
every bill appropriating the public moneys or property for local
purposes. This is not such a bill. That section is confined to
property of the State. (*In re Kingston*, 40 How. 444.) It is
not in violation of the constitutional prohibition against impair-
ing the obligation of contracts. (*People, ex rel. Hayden*, v.
*Rochester*, 50 N. Y. 525; *Darlington* v. *Mayor, etc.*, 31 id.
164.)

*R. E. Deyo* and *D. J. Dean* for respondent. The act of 1885 (Chap. 554) violates the provisions of section 6, article 1 of the Constitution, forbidding the taking of private property for public use without just compensation, and without due process of law. (*People* v. *Law*, 34 Barb. 494; Laws of 1842, chap. 306, § 3; 1 R. S. [7th ed.] 434; *People* v. *Allen*, 42 N. Y. 378; Gerard's City Water Rights and Streets, 127–165; *Brooklyn Park Comrs.* v. *Armstrong*, 45 N. Y. 234–243; *In re Albany Street*, 11 Wend. 148; *Embury* v. *Conner*, 3 Comst. 511.) It violates section 16, art. 3, "no private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." (*In re N. Y. E. R. R. Co.*, 70 N. Y. 327–336, 350; *Huber* v. *People*, 49 id. 142; *In re Blodgett*, 89 id. 392.) The contemplated contract with Harvey is not for an exclusive public use, and the legislature cannot compel the city to enter into it without its consent. (*People* v. *Batchellor*, 53 N.Y. 128; *Horton* v. *Town of Thompson*, 71 id. 513; *People* v. *Otis*, 24 Hun, 519.) It is a violation of that portion of section 18, article 3, which provides that the legislature shall not pass a private or local bill, "granting to any corporation, association or individual the right to lay down railroad tracks." (*In re N. Y. Elevated R. R. Co.*, 70 N. Y. 344; *In re Gilbert E. R. R.*, id. 361.) The property of a municipality is as much within the protection of the prohibition of the Constitution as is the property of an individual. (*People* v. *Otis*, 24 Hun, 519; *Webb* v. *Mayor, etc.*, 64 How. Pr. 10; *Corning* v. *Greene*, 23 Barb. 33, 60; *Benson* v. *Mayor, etc.*, 10 id. 223; *People* v. *Supervisors Westchester*, 4 id. 64.) A contract between the city and the railroad company for the benefit of third parties can be preserved and enforced by them. (*Lawrence* v. *Fox*, 20 N. Y. 268.)

FINCH, J. The legislation upon which the claim of the relator is founded discloses very questionable and peculiar characteristics. He is authorized to build an experimental section of elevated railway, not less than one-quarter of a mile in length, upon some duly authorized street of the city, with a view of

inventing or discovering improvements in the system which, if adopted, will make the existing structures less offensive or inconvenient. The section is to be not a model, but an actual operating railway, and yet is to be such wholly for experimental purposes; not transporting passengers or open for public use, but subject to continuous changes and trials born of new ideas, and made to test their effectiveness and value. The length of this experimental section beyond one-quarter of a mile is in the discretion of the relator. He may, if he chooses, extend it to the exterior bounds of the city. Its size, character and mode of construction are in like manner largely in his discretion, and he may thus obstruct an avenue of travel, or take away the property rights of abutters without any provision for their compensation. No time is limited for its continuance. So long as the relator is alive to invent or experiment he may test his ideas upon the structure built, or remodel and change it, unless the legislature shall put an end to the enterprise, or the relator determine that his improvement is complete. The law does not say to whom the improvements shall belong, or even that they shall be introduced on any existing or future elevated railway, and the result of the whole enterprise as planned by the statute will only be that the city and the State will learn that some things in mechanical engineering can or cannot be successfully accomplished. Of course the relator did not propose to thus educate himself and the city — himself by experiments and the city by results — at his own expense or without compensation; and the mode of accomplishing that is as unusual and peculiar as the enterprise to be paid for. Under an act passed in 1867 (Chap. 489), the West Side and Yonkers Patent Railway Company was authorized to build an elevated railway in Greenwich street and did so construct it, and was required to pay five per cent of its net income into the treasury of the city of New York as compensation for the use of the streets. By a supplemental act passed the next year (Chap. 865, Laws of 1868), this fund was required to be kept separate from other city funds and to be applied by the commissioners appointed under the original act to

the improvement of the occupied streets " by preserving or transplanting shade trees or by other embellishments or improvements of awnings or sidewalk structures," and this payment was declared to be " the legal compensation in full for the use and occupancy of the streets by said railway," and to constitute " an agreement in the nature of a contract between said city and constructing company." But in 1885 this fund, thus belonging to the city under what was called a contract and devoted to the improvement of its streets, was diverted to Charles T. Harvey, engineer, for building his "illustrative section." The whole sum then on deposit with the comptroller was about $168,000 ; and one-third of this was directed to be paid to Harvey " forthwith," " for the purpose of defraying the expenses of experiments as to said motive power now in progress, and for making surveys and other preparations for building said section." A " like amount " was to be paid "as the work upon said section progresses," — a stipulation quite significant — and then, when the section is complete, and certified by the governor, state engineer and mayor to have " demonstrated or developed material improvements in the methods of constructing or operating elevated railroads," all sums " remaining in or accruing to said fund " are to be paid over to Harvey, who, after having thus completed his section and its improvements, is nevertheless to continue experimenting with a view to " attaining the highest possible perfection ;" the annual five per cent to continue to be paid to him to aid his struggle toward that perfection " until the legislature shall otherwise direct." There is no provision in the act for an audit of the engineer's accounts; nothing which determines what proportion shall be compensation and what expenses; and he would be strangely disinterested if the latter did not dwindle to increase the former. It is true that he gave a bond, but that was conditioned only that he would faithfully perform his duties, or in other words, faithfully experiment.

That this arrangement was in fact an appropriation of the money of the city to the private benefit of the relator, at least so far as the portion now claimed to be payable is concerned,

and that the appearance of a public purpose thrown about it is colorable merely, is contended by the city and has much of probability to support it. The first one-third of the money is payable forthwith, cash down. Another third as the work progresses. The engineer is left at liberty to absorb the first third absolutely; to put it in his purse and keep it as his own ; he may then begin experiments and pay for them, and take his own compensation out of the second third, " as the work progresses," for that is the provision of the law ; and so there may be nothing which the city or the State has a legal right to demand of the engineer, as the consideration of the first payment. The engineer can begin no construction until upon some " duly authorized street." The city cannot give the authority in and of itself. (Laws of 1860, chap. 10.) The legislature has not done so and may never, and the relator will not be in default, and may rest quietly with the $56,000 in his possession, content with the situation. It is true that the law speaks of experiments " now in progress." But these were Harvey's experiments. No one directed him to make them. Neither the city nor the State, so far as the record shows, owed him any thing for that, or was under the slightest legal or equitable obligation to bear their expense or compensate him therefor. And, as to the " surveys " and preparation, he is left at liberty to treat them as part of the " work, " as they in fact are, and draw their expense from the second $56,000. The consideration for the first payment is not easily evolved from the terms of the law, and that a gift was intended in the nature of a reimbursement for losses sustained seems to be disclosed by the document handed up after the argument (Sen. Doc. 62), and it may very well be that the first payment of $56,000 was purposely placed in the power of the relator, upon a merely colorable consideration, in order to give him a gratuity to that extent. But since the possible facts, if we knew them all, might change the aspect of the case in this respect it is better to rest our conclusion upon a less debatable foundation.

The enactment violates section 18 of article 3 of the Constitution, which prohibits the passing of a local or private

bill "granting to any corporation, association or individual the right to lay down railroad tracks." The relator, or if he be treated as a mere agent, the municipality itself, is authorized by a bill which is certainly "local" if not "private" to build an elevated railroad in some street of the city. It is not a sufficient answer to say that the track thus to be "laid down" is merely experimental and temporary, for the language of the fundamental law is purposely very broad and draws no such distinction. But this track, although experimental, is not temporary. As we have seen, it is permanent and durable, having no limitation except the future will of the legislature. It will be a railroad not less than one-quarter of a mile long, and may be made much longer, and serve, under the guise of an experiment, to fasten in the end a new road upon the city. That this is not an idle supposition is indicated by the appellants' supplemental brief. After speaking of one possible interpretation of the law, he mentions another "which may validly carry with it the process of duly authorizing certain streets to be used for these railroad purposes through the medium of a constructing *corporation*, as intended by the legislature and the memorialist." The relator perhaps intended to organize a new corporation to help build his "illustrative section," and then own and run it, although the statute is innocent of any such expressed purpose. Wherever the road runs it must necessarily take either the fee of private owners or the property of abutters, for in all respects it is to be an elevated road. The act of 1885 describes it as "a new illustrative section of said form of railway," and going back to the act of 1867 to discover that form, we find it to be an elevated track on each side of the streets, supported by iron columns not less than fourteen feet above the level of the pavement. No provision is made for compensation to abutting owners or owners of the fee. For these reasons, without considering others which have been suggested, we are of the opinion that the act under which the relator claims is invalid.

The judgment should be affirmed, with costs.

All concur.

Judgment affirmed.